Appellee sued F. A. Barber, Mabel Barber, his wife, A. H. Murrie, and W. P. Goodloe and his wife, Julia Goodloe, individually and as independent executor of the estate of Emma Keeling, deceased, seeking to rescind a deed, made by him to Murrie, conveying title to lot No. 9, block 19, new city block No. 2331, west of San Pedro creek, in the city of San Antonio, and in the alternative to recover damages in the sum of $2,500. It was alleged that in 1915 appellee was the owner of the land mentioned, and was induced by the fraudulent representations of F. A. Barber as to the value of certain shares of stock owned by the latter and his wife, Mabel Barber, in a certain bank, to convey said land to A. H. Murrie, to be held for Barber, in exchange for said shares of bank stock, which were utterly worthless, and known to Barber and his wife to be without value. It was alleged that Barber was a director in the Federal Bank Trust Company, of San Antonio, and was an intimate friend of appellee, in whose representations he had full confidence, and that he represented to appellee that the shares were worth their par value of $100 per share. It was also alleged that Murrie was a party to and assisted in perpetrating the fraud, and that Mabel Barber knew of the fraud of her husband and agent, and participated in it. A conspiracy to defraud appellee was alleged to exist, and that the Goodloes participated therein. The cause was tried without a jury, and judgment was rendered in favor of the Goodloes, as innocent purchasers of the land, and in favor of appellee, individually and as independent executor of the estate of Emma Keeling, deceased, for $1,800, as against F. A. Barber, Mabel Barber, and A. H. Murrie. No one complains of the judgment in favor of the Goodloes.
In the fall of 1915, F. A. Barber, who was a friend of appellee, in whom he reposed full confidence, approached appellee upon the subject of purchasing certain bank shares, and represented to appellee that he and his wife, Mabel Barber, owned 18 shares of stock in the Federal Bank 
Trust Company of San Antonio, which were worth their full par value of $100 a share, which stock he would trade to appellee for the lot owned by him. He represented that the shares were very *Page 140 
valuable and would soon double in value. He said to appellee:
"I am interested in you, and I am interested in the bank down here, and we can just make good money out of that, and I am getting this line-up, and I am going to be a rich man after a while. If you want to, I will put you down on the ground floor, and get some stock in that, and in a few years you will be on `easy street,' because this stock is going to double in a little while, and will be five or six times the value that you pay for it. I want you to keep this quiet, because, if the banks get onto this, they will knock it, and perhaps break up the whole deal. Mr. Chambers is president of that bank, and he is a very shrewd, fine banker and business man and he is dealing now, negotiating to get perhaps about $15,000,000 war money, and he has just about got everything closed, and, of course, after he gets it closed up, then you can't get any stock, because it will be worth too much; but I have seen all the papers down there, as director In the bank, and I am in a position to know the ins and outs of the bank, what is going on, and I am just telling you this as a friend, and giving you an opportunity of getting some of this stock, and, if you want it, I will arrange for you to have some of the stock."
Appellee was so stirred by Barber's glowing account of the bank that he became eager to be "put down on the ground floor," and, not having any money, he traded his home, of the value of more than $1,800, to Barber for 18 shares of stock in the newly organized marvelous bank, that was on the very eve of getting "$15,000,000 of war money." The bank was organized and opened on September 14, 1915, and failed on February 22, 1916, having had a precarious existence of about five months. F. A. Barber knew, when he traded the stock for appellee's home, that the bank had never been solvent, and that the shares were worthless. The shares at no time had any value after the bank opened. Barber owned 1 share in the bank, that he traded to appellee; his wife owned the other 17 shares. Being a director, he must have known that more than $12,500 worth of shares had been sold, and, knowing that only that amount was in the bank when it opened for business, he must have known that some disposition had been made of the rest of the money.
The first, second, and third assignments of error are overruled. The facts were sufficient to show that the bonds were valueless when sold to appellee, and that F. A. Barber knew it. Barber was a director of the bank, claimed to know all about its affairs, and should have known that the shares were not worth their face value, when he gave such glowing accounts of them and predicted a wonderful rise in value, which would enrich him and his close friend. He knew how affairs of the bank were being conducted, because he was "in a position to know the ins and outs of the bank." He had no right to paint such roseate pictures of the present and future of the shares in the bank if he was ignorant of their value, for false representations will render a person liable, though innocently made, when the party making them had full opportunity to know their falsity. Davis v. Driscoll, 22 Tex. Civ. App. 14, 54 S.W. 43; Jesse French Co. v. Nolan, 38 Tex. Civ. App. 395, 85 S.W. 821; Morrison v. Adoue,76 Tex. 256, 13 S.W. 166. If, as the evidence shows, appellee believed the representations of F. A. Barber, the effect the representation would not be impaired by any evidence tending to show that appellee could, by an investigation, have ascertained the falsity of the representations. He had the right to rely absolutely on the representations of his friend, who was a director, and stated that he was fully acquainted with all the affairs of the bank, and moved in the inner circle of its business secrets. Wright v. Mort. Co., 42 S.W. 789; Loper v. Robinson, 54 Tex. 510
. Barber claimed to have, and did have as director, special knowledge of the value of the shares of bank stock, and he would be liable if the representations made by him were relied on by appellee and were false, although no confidential relations existed. The case of Baugh v. Houston,193 S.W. 242, decided by this court, so holds, although it is cited by appellant to sustain a contrary doctrine.
There is no merit in the fourth and fifth assignments of error. It does not matter whether F. A. Barber had 1 or 5 shares in the bank. He swore at one time that he had 1 or 5 shares, and at another that he had 1, and, if he was so uncertain about what he owned, it could not be expected that the trial judge could find how many shares he had, as he was the only witness who testified as to the number he owned. It is a matter of no importance anyway, for, if Barber and wife were both guilty of fraud, both were liable for the whole of the damages. The evidence fails to show that Mrs. Barber made any false representations, or that she knew that her husband, as her agent, had made such representations, and she is not liable under the facts, unless she is made so by being bound by the representations of her agent, and by an acceptance of the money arising from the perpetration of the fraud. The mere fact that her husband told her all about the trade did not tend to show that he told her about the misrepresentations he had made to appellee, nor tend to show that she knew that the shares were valueless. So, if knowledge of the fraud of the agent was necessary to bind a married woman, she is not liable.
A principal may become liable, by placing an agent in such a position, or by devolving certain duties, that making representations will fall within the scope of his authority, as, for instance, where he is clothed with full power to sell or dispose of property, in which case the making of representations would be a usual, if not a necessary, incident. It may be conceded that the principal intended that the agent should only *Page 141 
make truthful and fair representations; but a power to make representations would involve the power and possibility of the making of false and fraudulent ones, and, if he makes them, the principal will be responsible for them. Mechem on Agency, § 1987, and authorities in footnotes; Ryan v. Railway, 65 Tex. 13, 57 Am.Rep. 589; Head v. Express Co., 60 Tex. Civ. App. 169, 126 S.W. 682. The rule is well established, and the only question to be solved in connection with this case is whether the rule will apply to a married woman, acting through an agent. Of course, if the husband was acting as such, and not as the agent of his wife, the rule could not be applied.
At common law a married woman could not contract, and consequently could not appoint an agent to do what she could not do herself. The relation of principal and agent Is one based on a contract, and consequently one who cannot contract cannot have an agent. But there can be no reason for asserting that a married woman cannot be bound by the acts and representations of an agent in regard to anything about which she has the power to contract, for the power to contract about any subject-matter carries with it the power to appoint an agent to make the contract for her. Speers, Marital Rights, § 266; Morris v. Posner,111 Iowa 335, 82 N.W. 755.
Prior to the amendment of the law as to the rights of married women, of 1913 (Laws 1913, p. 61), the husband had the control and management of the wife's separate property in his hands, and she could not make any disposition of her property without being joined by her husband. In the amendment of 1913, however, it is provided:
"During marriage the husband shall have the sole management, control and disposition of his separate property, both real and personal, and the wife shall have the sole management, control and disposition of her separate property, both real and personal." Article 4621, Vernon's Sayles' Ann.Civ.St.
It will be noted that the same words are used in regard to the property of the wife as to that of the husband, and without the proviso which follows as to how she can dispose of her real property, and stocks and bonds, she would have the same rights and powers over her separate property as the husband would have over his separate property. The qualification relates only to the joinder of her husband in conveyances of real estate and the transfer of stocks and bonds, and did not apply to other personal property over which she has the same right of management, control, and disposition as the husband has over his property. Her husband had no power or authority over her property, and could not act in the capacity of a husband, but must necessarily have acted in the capacity of her agent, as he testified that he did. The bank stock was paid for with the proceeds arising from the sale of certain land, which was the separate property of Mrs. Barber. The fraud perpetrated by F. A. Barber, the agent of Mrs. Barber, became the fraud of his principal, and she was liable in damages arising from such fraud.
Mrs. Barber had the absolute right to contract for the sale of her stocks, and it is clear that if she had made the false representations in person to appellee, and she and her husband then jointly signed a transfer to appellee, she would be bound by such misrepresentations. If, after she had contracted to sell the shares to appellee, her husband had refused to join her in a transfer of them, she could, under proper facts, have obtained from a district court the authority to make the transfer alone. What she could do in person she could do by an agent. Mrs. Barber knew all about the sale of the shares, and fully concurred in such sale, and ratified the acts of the husband in making the sale, by accepting the proceeds of the sale.
The leading case denying the right of the wife to authorize her husband, through a power of attorney, to sell her separate property, is Cannon v. Boutwell, 53 Tex. 626, in which no real reasons for the holding are given; it being merely stated that it would be against the policy of the law. The holding has, however, been followed by other decisions; but in the case of Cardwell v. Rogers, 76 Tex. 37, 12 S.W. 1006, Judge Stayton follows the decision only because it had established a rule of property, and rather apologized for adhering to it. We have not seen in any Texas opinion any real valid reason for holding that the wife cannot authorize the husband to act as her agent in the execution of a deed to her separate real property, but the rule has been followed, because in Cannon v. Boutwell it was said it should be followed. We do not think, however, that the doctrine of those cases applies to this. Speers, Marital Rights, § 266.
Mrs. Barber had the undoubted authority, under the terms of article 4621, to contract for the sale of her shares, and, having such authority, she could appoint an agent to negotiate such sale, and, having the power to give such authority, she could give it to her husband. In the case of Cannon v. Boutwell, and the cases following it, the married woman had no authority to control, manage, or dispose of her separate estate; but those powers rested with her husband. The only power she possessed was to sign or refuse to sign the deeds presented to her by her husband. It can readily be seen that there was an open field for coercion given to the husband. In this case, however, "the control, management, and disposition of her separate property" is lodged in the hands of the married woman. In the cases mentioned the wives sought to give the husbands, not only authority to negotiate sales, but to execute deeds and sign their names thereto. In this case the wife merely gave the power to negotiate or arrange for a sale of personal *Page 142 
property, reserving to herself the right to make the transfer jointly with her husband. No power was given Barber to close the trade; but that power rested with her, and she exercised it, after being advised as to the terms. No question has been raised as to her making a valid transfer of the property. Under the facts of this case, no valid reason can be given adverse to Mrs. Barber's right to authorize her husband to act as her agent in negotiating a sale which she confirmed and ratified by transferring the stock in the bank. She became liable for the false representations of her husband, while acting as her duly appointed agent.
The appointment of F. A. Barber as agent interfered in no manner with her execution of the transfer required by statute, as was the case in Cannon v. Boutwell. Speaking of the married woman's responsibility for the torts of her agent, Judge Speers says:
"It is clear that, before a person can be held liable for the act of an agent, there must be the relation of principal and agent, or master and servant, existing between them. This relation, too, must be a contract relation. For the foundation of the rule, respondeat superior, is contract, express or implied, by means of which the servant stands in the place of the master, so that in law his act is regarded as the act of the master; and where there can be no contract the relation does not exist, and there is no foundation for the rule. So it follows that the wife is never liable for the act of another, save in those cases where that other is acting as her duly authorized agent, in a matter concerning which she is authorized by our law to contract with him. Her liability is now greater than it was at common law in this respect, since now there are many things that may be done by her through an agent; and where she may have an agent, and that agent commits a tort in the management of her business, there is nothing to prevent the rule of respondeat superior applying, as though she were sole. Doubtless it would be required that her contract with her agent be a personal, conscious one, and not mere statutory control and management given to her husband, for as to her this control is in no sense the result of contract. His torts, or the torts of those under him, in the management of her business, unless she has authorized them in some way, could not fairly be attributed to her."
Liability of a married woman for torts committed by a servant or agent is made to rest, by all the authorities, on her power to contract; the rule being that, when she is empowered to contract, she can be made liable, as can any other principal, for the torts of the agent. Discussing this question, Judge Cooley, in his work on Torts (page 197), says:
"In the recent changes in the common law effected by statute in the several states, whereby married women have been given an independent power to make contracts and to control property, it is not very clear how far the law of torts has been modified. We should probably be safe in saying that, so far as they give validity to a married woman's contracts, they put her on the same footing with other persons, and, when a failure to perform a duty under a contract is in itself a tort, it may doubtless be treated as such in a suit against a married woman. The same would probably be true of any breach of a duty imposed upon a married woman as owner of property which she possesses and controls the same as if sole and unmarried."
The text is supported by several decisions. Collier v. Struby,99 Tenn. 241, 47 S.W. 90; Ferguson v. Neilson, 17 R. I. 81, 20 A. 229, 9 L.R.A. 155, 33 Am. St, Rep, 855.
Article 4621, Vernon's Sayles' Ann. Stats., has conferred unusual powers on the married woman in Texas, and has thereby clothed her with unusual activities, and thereby multiplied and materially increased her burdens and liabilities. When clothed with the power and authority of a man, she must assume his responsibilities; for the extension of power always carries with it new and higher accountability.
The evidence fails to show the liability of A. H. Murrie. His effort to conceal the property of the Barbers from their creditors did not offer any inducement to appellee to part with his land, as all his connection with the case took place after the shares had been purchased. There is no theory presented by the facts upon which to predicate the liability of Murrie for the fraud practiced by F. A. Barber.
The judgment will be affirmed as to F. A. Barber and Mabel Barber, but will be reversed as to A. H. Murrie, and the cause, as to him, dismissed. *Page 143